IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CT-3090-D

| | | |
|---|---|---|
| DEREK HENDRICKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| SUPERINTENDENT KORNEGAY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

On April 22, 2013, Derek Hendricks ("Hendricks"), a state inmate proceeding pro se, filed suit under 42 U.S.C. § 1983 [D.E. 1]. Hendricks proceeds in forma pauperis [D.E. 6, 8]. On March 17, 2014, the court reviewed Hendricks's complaint pursuant to 28 U.S.C. § 1915A, dismissed as frivolous his claims arising at Warren Correctional Institution, and directed Hendricks to amend his complaint to name those defendants actually responsible for his remaining claim [D.E. 10]. On April 3, 2014, Hendricks filed an amended complaint [D.E. 11]. On May 2, 2014, the court reviewed Hendricks's amended complaint and allowed it to proceed, denied Hendricks's request for appointed counsel, and directed defendants to file an answer to the complaint within sixty days of service [D.E. 12].

Between May 15 and July 14, 2014, defendants were served with summonses [D.E. 14, 30, 43–44]. Between August 4 and September 25, 2014, defendants answered the complaint [D.E. 47, 58, 61] and moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) [D.E. 45, 50, 65]. On February 24, 2015, the court granted defendant Harrell's motion to dismiss, denied the remaining motions, and referred the action to Magistrate Judge Jones for entry of a

scheduling order to include a brief period of discovery [D.E. 77]. On February 25, 2015, Magistrate Judge Jones entered a scheduling order, setting deadlines of April 27, 2015, for completing discovery, and May 27, 2015, for filing all motions [D.E. 78].

On May 7, 2015, the court ruled on numerous motions, granting in part Hendricks's motions for discovery and allowing all parties until June 19, 2015, to file dispositive motions [D.E. 95]. The court did not rule on Hendricks's motion to compel [D.E. 92] because it was not yet ripe. [D.E. 95] 6. On May 12, 2015, defendant Owens responded in opposition to Hendricks's motion to compel [D.E. 96]. On June 10, 2015, Hendricks filed another motion to compel discovery and for appointment of counsel [D.E. 98], to which all defendants have responded in opposition [D.E. 99–100]. All defendants have moved for summary judgment [D.E. 101, 103]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Hendricks about the motions for summary judgment, the consequences of failing to respond, and the response deadlines [D.E. 106]. On July 16, 2015, Hendricks filed a motion for a jury trial [D.E. 107], and responded in opposition to the motions for summary judgment [D.E. 108]. On July 22, 2015, defendants Casino and Nelson filed a reply [D.E. 109] and responded in opposition to Hendricks's motion for jury trial [D.E. 110]. On August 7, 2015, Hendricks filed a sur-reply [D.E. 111]. As explained below, the court grants defendants' motions for summary judgment and denies Hendricks's motions.

I.

While Hendricks was incarcerated at Warren Correctional Institution ("Warren"), Hendricks "had an order for a Thera-Band twice a week from March 1, 2012–May 1, 2012." Casino Aff. [D.E. 101-2] ¶ 11b. Hendricks was "supposed to have a total of 18 sessions of exercise, but he only completed 12 sessions," because he refused four exercise sessions in March and April 2012, and failed to appear for two sessions in April 2012. Id. Nevertheless, on May 1, 2012, a Warren

2

physician reviewed Hendricks's medical chart and ordered (among other things) a physical therapy referral in response to Hendricks's complaint of ongoing back, rib, and knee pain. See Owens Aff. [D.E. 104] ¶ 7 & Ex. 3 (physician note); Casino Aff. ¶ 11c; cf. Am. Compl. [D.E. 11] 4 (alleging that a physician had issued "STRICT MEDICAL ORDERS for ongoing physical therapy" prior to Hendricks's transfer).

On May 2, 2012, Hendricks was transferred to Maury Correctional Institution ("Maury"), and Hendricks alleges that he discussed the need for physical therapy "at length" with a nurse upon initial screening. Am. Compl. 4–5; cf. Owens Aff. ¶ 9 & Ex. 2 (movement record). The screening nurse did not observe Hendricks to be in any apparent distress or that there were any abnormalities in his behavior, and Hendricks refused to sign the health screening form. Owens Aff. ¶ 9 & Exs. 2, 4. Nevertheless, the nurse "said she would bring the P.T. order to the attention of her supervisor and [defendant] Dr. Owens." Am. Compl. 5. On May 3, 2012, Owens reviewed Hendricks's medical chart and submitted utilization review ("UR") requests for a chest x-ray and physical therapy based on the previous physician's recommendations. Owens Aff. ¶ 10 & Ex. 5. Between May 2 and June 9, 2012, Hendricks submitted five sick-call requests, none of which concerned his knee pain or need for physical therapy. See id. ¶ 16 & n.5 & Exs. 6–8. During this time, nurses examined Hendricks on three occasions, and Owens reviewed Hendricks's medical chart twice. See id. ¶¶ 10, 12–15 & Exs. 5–6. During a May 16, 2012, appointment with a nurse, Hendricks stated that "he had submitted numerous Sick Call Appointment Requests regarding the need for physical therapy related to knee pain, and that his pain medication, Dolobid, was not effective for managing his pain." Id. ¶ 13 & Ex. 7. In response, "[t]he nurse's assessment was health-seeking behavior related to pain management . . . and [the nurse] instructed him to return to the clinic as needed." Owens Aff. ¶ 13 & Ex. 7; cf. Am. Compl. 6 (alleging that Owens "wouldn't evaluate [Hendricks's] knee after several

3

referralls [sic] and Medical Emergencies").

On June 10, 2012, Hendricks submitted a sick-call request complaining of pain in his lower back, right rib cage, right wrist, and left knee. Owens Aff. ¶ 17 & Ex. 9. When he submitted the sick-call request, Hendricks had a prescription for Tylenol Arthritis and Capsaicin for pain management. Id. On June 27, 2012, a nurse examined Hendricks in response to the sick-call request, observed that Hendricks's vital signs were normal and that he was alert and oriented, and referred Hendricks to Owens. Id. On July 2, 2012, Owens examined Hendricks, observing that Hendricks was alert and ambulated well and that "[t]here was some crepitus (grating or popping sound) present in his left knee with good range of motion." Id. ¶ 18 & Ex. 6; see Am. Compl. 4–5 (alleging that Hendricks's "knee injuries worsened with a clicking sound deformity, and Extreme Swelling and Pain"). Hendricks stated that a medication he had tried was ineffective for his pain, so Owens "ordered a trial of Voltaren (non-steroidal anti-inflammatory medication)." Owens Aff. ¶ 18 & Ex. 6. However, Owens decided not to order any further x-rays or a therapeutic exercise band until a physical therapist had seen Hendricks. Id. "For security reasons, TheraBands are not allowed to be kept in the inmate's possession or used without some type of supervision." Casino Aff. ¶ 7.

Between July 6 and August 22, 2012, Hendricks continued to receive regular medical attention for various medical conditions. Owens Aff. ¶¶ 19–41 & Exs. 6, 10–25. Hendricks saw nurses on at least ten occasions, and Dr. Owens either personally examined Hendricks or reviewed his chart and ordered various forms of medical treatment or testing, including x-rays, bloodwork, and a physical therapy consultation, on at least seven separate occasions. Id. Hendricks did not voice any complaints concerning his knee or the delay in receiving physical therapy until August 6, 2012, though he had a July 18, 2012, appointment with Dr. Owens. Id. During several of these encounters, health care providers found no objective medical evidence to support Hendricks's subjective

4

complaints of pain. See id. ¶¶ 19 (7/6/12 complaint of "jammed fingers" on Hendricks's left hand and intense pain; nurse noted that the fingers did not show any signs of injury or deformity, were "visually identical to those on the right," and that Hendricks "had full range of motion of his fingers"), 28 (7/27/12 x-ray of Hendricks's "lumbar spine was without fracture, subluxation, or other significant . . . abnormality"), 36 (Hendricks "walked with a steady gait and appeared to be neurologically intact" despite complaints of radiating pain and foot pain). Hendricks also refused to submit to necessary bloodwork in order to remain on his prescribed pain medication. Id. ¶¶ 35, 38–39 & Exs. 6, 19, 22–23.

On August 20, 2012, Owens ordered a repeat x-ray of Hendricks's right foot after a nurse "observed some deformity" and telephoned Owens to report Hendricks's symptoms. Id. ¶ 40 & Exs. 3, 21, 24. On August 22, 2012, Owens reviewed the x-ray taken the day before, and the "study . . . reported for the first time that inmate Hendricks had an acute undisplaced fracture of the base of the fifth metatarsal, with soft tissue swelling of the foot." Id. ¶ 41 & Ex. 25. Owens examined Hendricks and on August 30, 2012, submitted a UR request for an orthopaedic consultation for Hendricks's foot. Id. ¶¶ 41–42 & Exs. 25–26. On September 14, 2012, an orthopaedist examined Hendricks. Id. ¶ 45 & Exs. 21, 26. On September 18, 2012, Owens reviewed Hendricks's chart, and, following the orthopaedist's recommendations, "ordered that an urgent UR Request be submitted for . . . Hendricks to be fitted for a fracture shoe for a period of eight weeks . . . [and] a follow-up appointment at Orthopaedics East in six weeks." Id. ¶ 46 & Ex. 29. On September 27, 2012, Hendricks received his fracture shoe and "a nurse noted that he was . . . in no apparent distress," though "he complained of knee, ankle and hip pain." Id. ¶ 48 & Ex. 21. The following day, a nurse examined Hendricks in response to his complaints of pain and referred him to Owens, who scheduled an appointment for Hendricks on October 1, 2012. Id. ¶¶ 49–50 & Exs. 29–30.

5

Hendricks did not appear for his appointment with Owens. Id. ¶ 50 & Ex. 29.

Between October 8 and December 5, 2012, Hendricks continued to receive regular medical attention. Id. ¶¶ 51–66 & Exs. 29–39. He saw nurses on at least nine occasions, and the orthopaedist on one occasion. Id. Moreover, Dr. Owens either personally examined Hendricks or reviewed his chart and ordered various forms of medical treatment or testing, including a Thera-Band, a knee brace, exercises, progressively stronger pain medication,[1] and an orthopaedic consultation, on seven occasions. Id. During several of these encounters, health care providers could not find objective medical evidence to support Hendricks's subjective complaints of pain. See id. ¶¶ 51, 53–55, 57.

On October 31, 2012, Casino received an email from a programs director informing him that Hendricks had "complained that staff at Maury was being deliberately indifferent to his medical needs as he had not been seen for his knee by an orthopedic consult." Casino Aff. ¶ 11u; see Am. Compl. 5–6 (Hendricks complained to a "programs supervisor who thereby sent [defendant] Casin[o] an e-mail with regards to P.T."). Casino asked a nurse to investigate Hendricks's complaint and learned that Hendricks received treatment and had further medical examinations scheduled. Casino Aff. ¶¶ 11u, 14; cf. Am. Compl. 5–6 (alleging that Casino "never did get involve[d] or . . . answer any request" for medical attention).

---

[1] On October 22, 2012, during an examination by a nurse when "Hendricks' knee was not obviously swollen, red or hot" and his "range of motion in his left knee was good," Hendricks "requested that his pain medication be changed to Percocet (narcotic pain reliever)." Owens Aff. ¶ 57 & Ex. 32. On an unspecified date, a UR request for "Ultram (narcotic-like pain reliever)" was denied. Id. ¶ 62 & Ex. 36. On November 21, 2012, Owens prescribed a different pain medication (Tegretol) "to be administered to inmate Hendricks by direct observation to make sure that he was properly taking it." Id. ¶ 65 & Exs. 31, 37. By December 19, 2012, "[i]t was . . . noted that . . . Hendricks was not showing up in the medication line to receive his direct observation doses of Tegretol" and Owens directed a nurse to inform Hendricks "about the importance of Tegretol compliance and that he continue to exercise with the Thera-Band." Id. ¶ 69 & Exs. 37, 41. On December 31, 2012, Hendricks refused to continue taking Tegretol, and Owens discontinued the prescription on January 7, 2013. Id. ¶¶ 70–71 & Exs. 37, 41–42.

6

On December 7, 2012, a UR physician denied Owens's request for an orthopaedic consultation for Hendricks's knee, prescribing instead a course of treatment with steroid injections and physical therapy. Owens Aff. ¶ 67 & Ex. 33; see Am. Compl. 4–5 (alleging that the medical department at Maury "denied authorization" for an orthopaedic evaluation). Owens learned of the denial on January 9, 2013, after returning from vacation, and scheduled an appointment for Hendricks on January 17, 2013. Owens Aff. ¶¶ 72–73 & Exs. 41, 43. During his examination of Hendricks, Owens "observed that [Hendricks] ambulated well" and that his "left knee did not show any signs of swelling," but ordered pain medication, x-rays, and daily exercises with a Thera-Band. Id. ¶ 73 & Exs. 41, 43. Although Hendricks made two additional requests for a physical therapy consultation in January and February 2013, Owens reviewed Hendricks's chart in response and "did not believe that a physical therapy consultation was indicated" in light of Hendricks's Thera-Band exercises and medications. Id. ¶¶ 75–76, 78–79 & Exs. 39, 41, 45–46. "Between February 21, 2013 and April 21, 2013, . . . Hendricks did not voice any complaints regarding back, knee or wrist pain, and did not submit any requests for a physical therapy consultation." Id. ¶ 80.

As for defendant Nelson, the head nurse at Maury, Hendricks alleges that Nelson lied in responding to a grievance he filed in order to make it appear that he was receiving medical treatment when he was not. Am. Compl. 2, 6–7. On August 5, 2012, Hendricks filed the grievance complaining that "negligent employees [medical staff] at all times have been negligent towards Physical Therapy orders regarding Mr. Hendricks left knee." Nelson Aff., Ex. 3 [D.E. 101-3] 5 (brackets in original). On August 9, 2012, Nelson responded to the grievance, noting that Hendricks "was approved for . . . telemed therapy" but "refused to do the exercises that physical therapy prescribed" and "was schedule[d] again on 7-26-12 by Dr. Owens for physical therapy, and [was] waiting for an appointment." Id. 6. Nelson was not directly involved in Hendricks's course of

7

medical care. Nelson's "role in this case [was] limited to responding to Plaintiff's Grievance wherein [Nelson] determined that a physician was following Plaintiff, that physical therapy had been ordered for Plaintiff, and that Plaintiff was waiting for therapy to be scheduled." Id. ¶ 10.

As Nelson describes the procedure for providing an inmate with physical therapy,

> a physician has to order physical therapy. Physical therapy thereafter has to be approved by the Utilization Review Board. Upon approval, details regarding the therapy have to be worked out such as where an inmate is going to undergo the therapy and when and under what conditions the services will be provided to the inmate (which is often dependent upon the availability of therapists and services in the area).

Id. ¶ 9. In Hendricks's case, although Owens's UR request for physical therapy was approved on June 7, 2012, Owens Aff. ¶ 10 & Ex. 5, there were numerous delays in arranging for an initial appointment. The UR board instructed Maury medical staff to attempt to provide the physical therapy appointments through telemedicine, "but staff at Maury CI was having trouble locating an available telemedicine provider." Casino Aff. ¶¶ 11d–f. "Due to the issues that staff was having finding an available telemedicine provider at East Carolina University, Dr. Owens, on July 26, 2012, wrote an order to schedule Plaintiff for the PT clinic at Lenoir Memorial Hospital." Id. ¶ 11h. However, the hospital declined to accept a prison inmate as a patient. Id. ¶ 11i. Maury staff provided Hendricks with instructions for knee exercises while they continued to work on scheduling a physical therapist. Id. ¶ 11j. Hendricks's initial physical therapy appointment was further delayed after he injured his right ankle and foot while playing basketball. Id. ¶¶ 11k, n; see Owens Aff. ¶ 29 & Exs. 6, 16.

II.

As for Hendricks's motions to compel discovery and for appointment of counsel, Hendricks seeks "any and all material under the Consent[] Order along with material sought" in Hendricks's

8

prior discovery requests. [D.E. 92] 3; see also [D.E. 98] 3.[2] On May 7, 2015, the court "denie[d] Hendricks's discovery requests (including interrogatories) other than his request for 'complete prison records . . . as reports about plaintiff's Strict Medical Orders, made by medical staff, DAC's employees, and witnesses' and Hendricks's 'complete medical file' between May 2012 and April 2013." 5/7/15 Order [D.E. 95] 6. On May 28, 2015, defendants produced these materials for Hendricks. [D.E. 97]. The court denies the motions as moot. To the extent Hendricks renews his request for appointed counsel, [D.E. 98] 2, the court again denies the request. Finally, the court denies as moot Hendricks's motion for a jury trial [D.E. 107].

Next, the court addresses defendants' motions for summary judgment. In considering the motions for summary judgment, the court views the evidence in the light most favorable to the non-movant and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 325. Once the movant has met its burden, the nonmoving party then must affirmatively demonstrate

---

[2] On September 17, 2014, Magistrate Judge Jones ordered the production of certain confidential information, including personnel files, Hendricks's medical and other inmate records, and "[r]eports of, investigations into, and any findings regarding alleged incidents or denials, relating to medical treatment and care by any named Defendant against Plaintiff or anyone other than the named Plaintiff." 9/17/14 Order [D.E. 63] 3–4. To the extent that these materials include documents other than what the court ordered defendants to disclose to Hendricks, such as "emails containing information without shaded over texts," [D.E. 98] 1, the court denies Hendricks's request.

9

that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. When evaluating affidavits submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence (such as hearsay) described in such affidavits. See Fed. R. Civ. P. 56(c)(2); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

To establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physicians as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation and citation omitted).

"[D]eliberate indifference entails something more than mere negligence, . . . [but it] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Deliberate indifference requires that an official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837; De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; Makdessi v. Fields, 789 F.3d 126, 133–35 (4th Cir. 2015). "It is not enough that the [prison official] should have recognized" the objectively serious condition, medical need, or risk of harm. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004). Rather, a plaintiff must prove "actual knowledge of the risk of harm to the inmate." Iko, 535 F.3d at 241 (emphasis omitted).

10

However, "[a] prison official's subjective actual knowledge can be proven through circumstantial evidence." Makdessi, 789 F.3d at 133. "[A]n injury might be so obvious that the factfinder could conclude that the guard did know of it because he could not have failed to know of it." Id. (quotation omitted). A prisoner's failure to give advance warning of, or protest exposure to, the risk is not dispositive concerning actual knowledge. Id. at 135.

Beyond such actual knowledge, the prison official "must also have recognized that his actions were insufficient to mitigate" the objectively serious condition, medical need, or risk of harm. Iko, 535 F.3d at 241 (quotation and emphasis omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986); see Wilson v. Seiter, 501 U.S. 294, 298–99 (1991). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241.

Hendricks has failed to create a genuine issue of material fact concerning whether any defendant was deliberately indifferent to a serious medical need. The medical records demonstrate that Owens provided Hendricks with constant medical treatment and to the extent that he rejected Hendricks's request for physical therapy, Owens did so based on his determination that Hendricks's condition did not warrant such therapy. See, e.g., Petties v. Carter, 795 F.3d 688, 691–92 (7th Cir. 2015) (per curiam); Bridges v. Keller, 519 F. App'x 786, 787–88 (4th Cir. 2013) (per curiam) (unpublished); Goris v. Breslin, 402 F. App'x 582, 585 (2d Cir. 2010) (per curiam) (unpublished); Ward v. Deboo, No. 1:11CV68, 2012 WL 2359440, at *14–15 (N.D. W. Va. Jan. 18, 2012), report and recommendation adopted, 2012 WL 2359435 (N.D. W. Va. June 20, 2012), aff'd, 482 F. App'x 852 (4th Cir. 2012) (per curiam) (unpublished).

Hendricks also has failed to show that the delay in initially receiving physical therapy

11

violated the Eighth Amendment. See Thomas v. Poveda, 518 F. App'x 614, 620 (11th Cir. 2013) (per curiam) (unpublished), cert. denied, 134 S. Ct. 529 (2013); Small v. Visinsky, 386 F. App'x 297, 300 (3d Cir. 2010) (per curiam) (unpublished). Hendricks's personal belief that he required more appointments with an orthopaedist or a physical therapist amounts to nothing more than a difference of opinion as to course of treatment, which fails to state a claim of constitutional magnitude. See, e.g., Petties, 795 F.3d at 691–92; Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (unpublished); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam).

As for Hendricks's argument that there was "no reason why at Maury [physical therapy] couldn't be provided" given that he received physical therapy at Warren, [D.E. 108-2] 42, a disagreement between medical professionals on the appropriate course of treatment does not constitute deliberate indifference on the part of one such professional. See, e.g., United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011); Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977). Thus, the court grants summary judgment to defendants.

III.

In sum, the court GRANTS defendants' motions for summary judgment [D.E. 101, 103] and DENIES plaintiff's motions [D.E. 92, 98, 107]. The clerk shall close the case.

SO ORDERED. This 20 day of October 2015.

JAMES C. DEVER III
Chief United States District Judge

12

Case 5:13-ct-03090-D   Document 114   Filed 10/20/15   Page 12 of 12